UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-510-F

| | | |
|---|---|---|
| MEDICAL MUTUAL INSURANCE | ) | |
| COMPANY OF NORTH CAROLINA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| AMERICAN CASUALTY COMPANY OF | ) | |
| READING, PA. | ) | |
| Defendant/Counter-Plaintiffs. | ) | |

Plaintiff Medical Mutual Insurance Company of North Carolina ("Medical Mutual")

initiated this civil action for declaratory relief on October 7, 2008, pursuant to 28 U.S.C. § 2201

and Rule 57 of the Federal Rules of Civil Procedure, seeking a declaration that it has no duty to

defend or obligation to indemnify Mechelle Smith ("Smith") for the professional liability claims

asserted against her in the underlying action entitled *Linda R. Cox, Marie R. Miller, Ellen R.*

*Riddick, Co-Executrixes of the Estate of Elizabeth Rountree, Deceased v. Victor G. Sonnino,*

*M.D. (aka Vittorio Guy Sonnino, M.D.), Mechell Smith, N.P.-C, Northeast Neuroscience, P.S., et*

*al.* 06 CVS 224 (the "Rountree Action"). Defendant American Casualty Company of Reading,

PA ("American Casualty") has asserted a Counterclaim against Medical Mutual seeking to

recover all amounts that American Casualty paid in the defense and indemnification of Smith.

The matter is now before the court on cross-motions for summary judgment. The parties'

respective motions have been fully briefed and are now ripe for disposition.

## I. FACTUAL BACKGROUND

The undisputed facts, as set forth by the parties, and the record, are as follows:

## A. The Medical Mutual Policy

On August 13, 2003, Medical Mutual added Smith, a nurse, as a named insured to the claims-based professional liability insurance policy no. PG112673 it had issued to Northeast Neuroscience PC ("the Medical Mutual policy"). American Casualty Mot. for Summ. J., Ex. C [DE-23-5]. The Medical Mutual policy was effective from December 1, 2002 to December 1, 2003. *Id.*, Ex. D [DE-23-6]. Renewal policies were subsequently issued for the policy periods of December 1, 2003 to December 1, 2004, and December 1, 2004 to December 1, 2005. *Id.*, Ex. A [DE-23-3], Ex. E [DE-23-7].

The Medical Mutual policy is subject to liability limits in the amount of $1,000,000.00 per claim and $3,000,000.00 in the aggregate. Med. Mut. Mem. in Support of Mot. for Summ. J. [DE-22-2], Ex. 1 ("Med. Mut. Policy"). Smith was listed as an insured under Coverage A of the policy, and her premium was $938.00. *Id.* The Medical Mutual policy provides in its insuring agreement, in pertinent part, the following:

> I.  **INSURING AGREEMENT**
> In consideration of the payment of the premium due for this policy, the information provided by an **Insured** including that for obtaining or continuing this policy, the statements contained in the Declarations Page made a part hereof, and subject to the Limits of Liability, Exclusions, Conditions, and other terms of this policy, Medical Mutual Insurance Company of North Carolina ("the Company") agrees with the **Insured** that:
>
> A.  **For Individual Personal Liability**
> The Company shall pay on behalf of each **Insured** listed under "Coverage A" of the Declarations all damages which the **Insured** shall become legally obligated to pay because of an **incident** arising out of the rendering of or failure to render **professional services** on or after the Retroactive Date stated in the Declarations and for which claim is made during the policy period.

Med. Mut. Policy [DE-22-2] at p. 2 (emphasis in original).

2

The "Exclusions" section of the Medical Mutual policy provides the following:

**IV.    EXCLUSIONS**

> **This Insurance does not apply to:**
> \*\*\*
> **(g)** damages arising out of or in connection with any **injury** resulting from rendering of or failure to render **professional services** by an **Insured** prior to the policy period if such damages are covered wholly or in part, by any other insurance or a self-insured, retained risk or risk sharing plan or program;

Med Mut. Policy [DE-22-2] at pp.3-4 (emphasis in original).  The "Policy Conditions" section also provides:

**E.    Other Coverage**

> Except as provided in Exclusion "g", this insurance is excess over any other valid and collectable coverage applicable to a claim against any **Insured**.  All other insurance whether stated to be primary, pro rata, contributory, excess, or contingent will first apply, as will any provision under a self-insured retained risk or risk sharing plan or program.

*Id.* at p. 8 (emphasis in original).

**B. The American Casualty Policy**

In exchange for a premium of $89.00, American Casualty issued an <u>occurrence-based</u> "Healthcare Providers Professional Liability Insurance" policy, policy number 0160624325 ("the American Casualty policy"), to Smith, effective from March 13, 2003 to March 13, 2004.   Med. Mut. Mem. in Support of Mot. for Summ. J., Ex. 2 [DE-22-3] ("The American Cas. Policy"). The American Casualty policy is subject to liability limits of $1,000,000.00 for each claim and $6,000,000.00 in the aggregate.  *Id.*

The American Casualty policy provides, in pertinent part, the following:

**I.    COVERAGE AGREEMENTS**

3

Coverage under any of the following agreements apply only to acts, errors, or omissions, including **medical incidents** . . . which occurred on or after the effective date of coverage, and before the expiration of the **policy period** stated on the **certificate of insurance**.

\*\*\*

A.  PROFESSIONAL LIABILITY
We will pay all amounts, up to the Professional Liability limit of liability stated on the **certificate of insurance,** that **you** become legally obligated to pay as a result of a **professional liability claim** arising out of a **medical incident** by **you** . . . .

*Id.* at p. 15 (emphasis in original). The American Casualty policy, like the Medical Mutual policy, also includes an "other insurance" provision. Located in the "Common Conditions" section, the provision provides:

VIII.  **OTHER INSURANCE AND RISK TRANSFER AGREEMENTS**
If there is any other insurance policy or risk transfer instrument, including but no limited to, self-insured retentions, deductibles or other alternative arrangements ("other insurance") that applies to any amount payable under this Policy, such other insurance must pay first. It is the intent of this policy to apply only to the amounts covered under the Policy which exceed the available limit of all deductibles, limits of liability or self-insured amounts of the other insurance, whether primary, contributory, excess, contingent, or otherwise. This insurance will not contribute with any other insurance. In no event will we pay more than our limit of liability.

These provisions do not apply to other insurance written as specific excess insurance over the limits of liability of this policy.

*Id.* at p. 5 (emphasis in original).

**C. The Rountree Action**.

On March 9, 2006, the Rountree Action was commenced in the General Court of Justice, Superior Court Division, Pasquotank County, North Carolina. The complaint in the Rountree Action alleges that (a) Elizabeth Rountree ("Rountree") was admitted to Albemarle Hospital in

4

Elizabeth City, North Carolina, on or about February 23, 2004, for decompressive laminectomies and excision of herniated discs to be performed by Dr. Victor Sonnino; (b) was discharged on February 25, 2004; (c) presented at the emergency room at Albemarle Hospital with certain symptoms on March 3, 2004; (d) was transferred to Sentara Norfolk General Hospital on March 5, 2004 and (e) died from complications of sepsis on March 20, 2004. Answer, Ex. C [DE-10-4]. The complaint further alleged that Smith was negligent in that she failed to adequately monitor, diagnose, treat, and respond to Rountree's condition during her admission to Albemarle Hospital between March 3, 2004 and March 5, 2004.

Dr. Sonnino first provided notice of what would become the Rountree Action to Medical Mutual on April 1, 2005. Pursuant to Medical Mutual's practice and procedure, each named insured on a claims-made policy issued to a medical practice receives the benefits of the original claim report date. Therefore, Smith is considered by Medical Mutual to have provided notice of the Rountree Action on April 1, 2005.

It is undisputed that after Smith advised American Casualty of the Rountree Action, the company began defending her. American Casualty asked Medical Mutual to participate in the defense and indemnification of Smith, but Medical Mutual declined, stating the operation of Exclusion (g) of the Medical Mutual policy precluded coverage for Smith. Specifically, Medical Mutual contended its policy precluded coverage for Smith because the claims were for damages for the rendering of or failure to render professional services by Smith prior to the Medical Mutual policy period, and because such damages were covered in whole or in part by the American Casualty policy. Medical Mutual did defend Dr. Sonnino and the practice in the Rountree Action.

5

A court-ordered mediation in the Rountree Action took place on September 30, 2008, and all claims were settled on December 11, 2008. American Casualty requested that Medical Mutual indemnify Smith in connection with the settlement, and Medical Mutual refused, again stating that Exclusion (g) precludes coverage.

Medical Mutual thereafter initiated the instant action seeking a declaration that it has no duty to defend or obligation to indemnify Smith for the professional liability claims asserted against her in the Rountree Action. American Casualty asserted a Counterclaim against Medical Mutual seeking to recover all amounts that American Casualty paid in the defense and indemnification of Smith. Both parties have filed motions for summary judgment, which have been fully briefed and are now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Electric Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he interpretation and construction of insurance policies is a matter of law, and, therefore, such cases are particularly amenable to summary judgment." *John Deere Ins. Co. v. Shamrock Industries, Inc.*, 929 F.2d 413, 417 (8th Cir. 1991).

6

## III. DISCUSSION

In this action, it is clear that either policy would provide coverage to Smith had the *other* policy not been in existence. Both policies do exist, however, and both Medical Mutual and American Casualty vigorously dispute the effect of their policies' coexistence.

Medical Mutual contends that the American Casualty policy triggers the operation of the Medical Mutual policy's Exclusion (g) and therefore excludes coverage for Smith. American Casualty contends, however, that its policy does not set into operation Exclusion (g) of the Medical Mutual policy. Moreover, American Casualty argues that the specific language of its "other insurance" clause must be given effect over the "other insurance" clause in the Medical Mutual policy. With this background in mind, the court turns to North Carolina law[1] to help examine the heart of the parties' dispute.

### A. North Carolina Law

With insurance contracts, as with all other contracts, "the goal of construction is to arrive at the intent of the parties when the policy is issued." *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505, 246 S.E.2d 773, 777 (1978). The intent of the parties is determined by the plain language of the policy. *Id.*

> The various terms of the policy are to be harmoniously construed, and if possible, every word and every provision is to be given effect. If, however, the meaning of the words or the effect of provisions is uncertain or capable of several reasonable interpretations, the doubts will be resolved against the insurance company and in favor of the policyholder. Whereas, if the meaning of the policy is clear and only one reasonable interpretation exists, the courts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein.

---

[1] Both parties agree that North Carolina law governs this dispute.

7

*Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299-300, 524 S.E.2d 558

(2000)(citations omitted).

Where, as here, multiple policies appear to provide coverage for the same loss, the North

Carolina Supreme Court has counseled:

> The terms of another contract between different parties cannot affect the proper construction of the provisions of an insurance policy. The existence of the second contract, whether an insurance policy or otherwise, may or may not be an event which sets in operation or shuts off the liability of the insurance company under its own policy. Whether it does or does not have such effect, first [,] requires the construction of the policy to determine what event will set in operation or shut off the company's liability and, second, requires a construction of the other contract, or policy, to determine whether it constitutes such an event.

*Allstate Ins. Co. v. Shelby Mut. Ins.* Co., 269 N.C. 341, 346, 152 S.E.2d 436, 440 (1967). In

undertaking this exercise, a court should keep in mind that ambiguous provisions are construed

in the manner most favorable to the insured, and "[e]xclusions from and exceptions to

undertakings by the company are not favored." *Id.*

## B. Applying North Carolina's rule of construction to the policies

Under *Shelby Mutual*, the court first must examine the Medical Mutual policy to

determine what events set in operation or shut off Medical Mutual's liability. Here, there is no

question that Dr. Sonnino's report to Medical Mutual of the impending Rountree Action

triggered the applicability of Medical Mutual's claims-based policy. As this court already has

noted, however, Medical Mutual contends that Exclusion (g) operates to preclude coverage for

the claim against Smith. That exclusion provides:

> This Insurance does not apply to:
> . . .
>     (g) Damages arising out of or in connection with any injury resulting from

8

rendering of or failure to render professional services by an Insured prior to the policy period if such damages are covered wholly or in part, by any other insurance or self-insured, retained risk or risk sharing plan or program.

Med Mut. Policy [DE-22-2] at pp. 3-4. Pursuant to *Shelby Mutual*, this court has to examine whether Exclusion (g) is triggered. Under the terms of Exclusion (g), insurance will not be provided if (1) the damages arose of an injury resulting from the rendering of professional services prior to the policy period; and if (2) such damages are covered wholly or in part by any other insurance.

The first part of Exclusion (g) is satisfied–the damages asserted in the claim arose from an injury resulting from the rendering of Smith's professional services on March 3-5, 2004, which are dates prior to the Medical Mutual policy. Thus, the question is whether the damages are covered wholly or in part by other insurance–namely, the American Casualty policy.

The court must now examine the American Casualty policy to determine whether it constitutes "other insurance" within the meaning of Exclusion (g). The American Casualty policy provides coverage for injuries which are the result of medical incidents that occurred on or after the effective date of coverage, and before the expiration date stated on the certificate of insurance. In this case, the effective dates of coverage were from March 13, 2004 to March 13, 2004. The claim at issue in this case, therefore, appears to come within the coverage of the American Casualty policy. As this court already has noted, however, the American Casualty policy also has an "other insurance" provision within it, which provides:

> If there is any other insurance policy or risk transfer instrument, including but not limited to, self-insured retentions, deductibles, or other alternative arrangements ("other insurance"), that applies to any amount payable under this Policy, such other insurance must pay first. It is the intent of this policy to apply only to the amounts covered under this Policy which exceed the available limit of all

9

deductibles, limits of liability or self-insured amounts of the other insurance, whether primary, contributory, excess, contingent, or otherwise. This insurance will not contribute with any other insurance. In no event will we pay more than our limit of liability.

The American Cas. Policy [DE-22-3] at p. 5. Because of the existence of the Medical Mutual policy, American Casualty contends its "other insurance" provision is triggered, and its policy only provides "excess coverage." Relying on *Shelby Mutual* and the North Carolina Court of Appeals' decision in *Horace Mann Insurance Company v. Continental Casualty Company*, 54 N.C. App. 551, 284 S.E.2d 211 (1981), American Casualty argues that an "excess" policy cannot constitute "other insurance" within the meaning Exclusion (g).

In response, Medical Mutual offers two main arguments as to why the American Casualty policy constitutes "other insurance" within the meaning of Exclusion (g): (1) the American Casualty policy was the only policy in effect at the time of the actual occurrence giving rise to the Rountree Action, and therefore the American Casualty policy's "other insurance" clause is not triggered, and (2) Exclusion (g) constitutes a valid "super-escape" clause which should be given effect.[2] The court will examine each of these contentions in turn.

---

[2] Medical Mutual also appears to contend that as a general matter, North Carolina courts give effect to exclusions in claims-made policies where occurrence-based coverage applies. Medical Mutual is correct that in two separate cases, *Ames v. Continental Casualty Company*, 79 N.C. App. 530, 340 S.E.2d 479 (1986), and *Gaston County Dyeing Machine Company v. Northfield Insurance Company*, 351 N.C. 293, 524 S.E.2d 558 (2000), North Carolina courts ruled that occurrence-based policies, as opposed to other claims-based policies, provided primary coverage to the insured. The courts' rulings in *Ames* and *Gaston County*, however, were not based simply on the fact that there were competing "claims-based" and "occurrence-based" policies, with the "occurrence-based" policies being deemed the primary coverage by default. Rather, the courts in both cases adhered to the rules of construction the North Carolina Supreme Court set forth in *Shelby Mutual Insurance*. *See* 269 N.C. at 346, 152 S.E.2d at 440 (explaining that a court must first examine a policy "to determine what event will set in operation or shut off the company's liability and, second, [examine] the other contract, or policy, to determine whether it constitutes such an event"). Moreover, both *Ames* and *Gaston County* are distinguishable from

10

### 1. Timing of policies

In examining whether the American Casualty policy constitutes "other insurance" within the meaning Exclusion (g), Medical Mutual contends that this court "is required" to evaluate the American Casualty policy "as of the date of the occurrence that triggered coverage." Med. Mutual Mem. in Opp. to Def.'s Mot. for Summ. J. [DE-26] at p. 5. Because the alleged acts giving rise to the Rountree Action occurred on March 3-5, 2004, and because the applicable Medical Mutual claims-based policy did not take effect until December 1, 2004, Medical Mutual argues that its policy was not "in effect" on the date of the occurrence. Consequently, according to Medical Mutual, the "other insurance" clause in the American Casualty policy is not set into operation, and American Casualty provides primary coverage for the Rountree Action. The court disagrees.

The court has not found any support for Medical Mutual's assertion that the "other insurance" clause in the American Casualty policy must be evaluated "as of the date of the occurrence that triggered coverage." Notably, Medical Mutual did not provide any citation for the assertion in its memorandum in opposition to American Casualty's motion for summary judgment. In its reply in support of its own motion for summary judgment, Medical Mutual cites

---

the circumstances in this case. The opinion in *Ames* contains no indication that the "occurrence-based" policy had any "other insurance" clause that was applicable. *See* 79 N.C. App. at 533-35; 340S.E.2d at 482-83. In *Gaston County*, the North Carolina Supreme Court examined the "occurrence-based" policy and determined that the specific language in policy's "other insurance" clause was not triggered by the other "claims-made" policy. 351 N.C. at 306, 524 S.E.2d at 566-67. All the parties concede that the actual language in the policies at issue in *Gaston County* differ significantly from the polices in this case. In any event, there is no indication in either decision that North Carolina adheres to an overarching rule which dictates that occurrence-based policies always will be deemed to provide primary coverage.

11

to *Gaston County* as support for this proposition. Med. Mutual Reply [DE-28] at p. 3. In *Gaston County*, the North Carolina Supreme Court *did* rule that "where the date of the injury-in-fact can be known with certainty, the insurance policy or policies on the risk on that date are triggered." 351 N.C. at 303, 524 S.E.2d at 564. However, that ruling was with regard to *which policy year of consecutive policies from the same companies* were applicable to a claim. When the *Gaston* court went on to examine which of the policies from separate companies provided primary coverage, it did not restrict its analysis of the policies in question, including their respective "other insurance" clauses, to the exact moment when the coverage was triggered under the various policies. Instead, the *Gaston* court examined the plain language of the policies, and their "other insurance" clauses, and made no mention of their respective "trigger" dates. *See id.* at 305-308, 524 S.E.2d at 566-68.

Moreover, as American Casualty notes, under the method of analysis advocated by Medical Mutual, an "other insurance" clause in an occurrence-based policy would never be given effect where a subsequently-issued claims-based policy covers the same occurrence. Indeed, taking Medical Mutual's proposition to the end of the logical envelope, an examination of whether the subsequently issued claims-based policy implicated the "other insurance" clause of an occurrence-based policy would be unnecessary, whether or not the claims-based policy was in existence at the time of the occurrence. This is because, by definition, an occurrence-based policy *always* would be triggered before a claims-based policy, whether the claims-based policy was in existence at the time of the occurrence or not. This court has not found support for such a proposition in North Carolina cases, and will not create such a rule here. Consequently, the court will not restrict its analysis of the "other insurance" clause in the American Casualty policy to the

12

exact moment coverage was triggered under the policy.

## 2. Is Exclusion (g) a "super-escape" clause?

Even if this court does not restrict its analysis of the "other insurance" clause to the exact moment coverage was triggered under the American Casualty policy, Medical Mutual still contends the American Casualty policy is "other insurance" within meaning of Exclusion (g). Specifically, Medical Mutual contends that Exclusion (g) may be read as a "super-escape" clause which bars coverage where there is occurrence-based coverage for an event that occurred before the Medical Mutual policy period.

This argument necessitates a review of the various terms used by courts to describe common "other insurance" clauses in insurance policies. An "excess clause" in an insurance policy " 'generally provides that if other valid and collectible insurance covers the occurrence in question, the "excess" policy will provide coverage only for liability above the maximum coverage of the primary policy or policies.' " *Horace Mann Ins. Co.,* 54 N.C. App. at 555, 284 S.E.2d at 213(quoting 8A APPLEMAN, INSURANCE LAW & PRACTICE § 4910 (1981)). *See also* 15 COUCH ON INSURANCE § 219:5 (3d ed. 1999)(explaining that an "excess clause" provides that an insurer will pay a loss only after other available primary insurance is exhausted")). An "escape clause," in contrast, typically " 'provides that there shall be no coverage where there is other valid and collectible insurance.' " *Id.* (quoting 8A APPLEMAN, INSURANCE LAW & PRACTICE § 4910). *See also* 15 COUCH ON INSURANCE § 219:5 (describing an "escape clause" as providing "that an insurer is absolved of all liability where other coverage is available"). North Carolina courts have described a specific type of escape clause–the "super escape" clause–as being "one which expressly provides 'that the insurance does not apply to any loss covered by other

13

specified types of insurance, including the excess insurance type . . . .' "*Aetna Cas. Ins. & Surety Co. v. Cont'l Ins. Co.*, 110 N.C. App. 278, 282, 429 S.E.2d 406, 409 (1993)(quoting *Horace Mann Insurance*, 54 N.C. at 555, 284 S.E.2d at 213)). *See also* 15 COUCH ON INSURANCE § 219:36 (explaining that a "super escape clause" is "a more far-reaching version of the escape clause" and "states that the insurance will not apply to any liability for a loss that is covered on a primary, contributory, excess, or any other basis by insurance in another insurance company").

Using these labels, various decisions from the North Carolina Court of Appeals have articulated the following principles for resolving conflicts between multiple policies with "other insurance" clauses:

> When a standard escape clause in one policy competes with an excess clause in another policy, the policy with the standard escape clause is considered primary, and the policy with the excess clause is considered secondary, or excess. However, when a super escape clause in one policy competes with an excess clause in another policy, the super escape clause is given effect and the insurer whose policy contains the super escape clause is absolved from liability. When two policies contain identical excess clauses, or excess clauses which are worded in such a way that it is impossible to distinguish them or to determine which policy is primary, the clauses are deemed to be mutually repugnant and neither excess clause will be given effect.

*Aetna Casualty*, 110 N.C. App. at 282, 429 S.E.2d at 409 (internal citations and quotes omitted).

Based on these labels and principles discussed above, the parties spend much time discussing whether Exclusion (g) in the Medical Mutual policy constitutes a "standard escape clause" or a "super escape clause." Although this court recognizes that the North Carolina Court of Appeals has used the labels and principles described above in reaching conclusions on which policies should be deemed primary, those opinions relied on the North Carolina Supreme Court's decision in *Shelby Mutual Insurance*, which, at bottom, focuses on the principles of insurance

14

contract construction.

### a. *Shelby Mutual*

In *Shelby Mutual*, the North Carolina Supreme Court addressed whether the existence of a liability policy with an "excess" clause issued by the Allstate Insurance Company was an event which cut off the liability of Shelby Mutual under its own policy. The Shelby Mutual policy defined "Persons Insured," in pertinent part, as follows:

> Each of the following is an insured under Part 1, except as provided below:
>
> (3) . . . any of the following persons while using such automobile with the permission of the named insured, provided such person's actual operation . . . is within the scope of such permission:
>
> . . .
>
> (b) any other person, but only if no other valid and collectable automobile liability insurance, Either primary or excess . . . is available to such person.

269 N.C. 341, 344, 152 S.E.2d 436, 439. The Allstate Insurance policy provided that its coverage would be "excess insurance over any other valid and collectible insurance." *Id.*

In examining the issue, the *Shelby Mutual* court noted "the leading case" of *Zurich General Accident & Liability Insurance Company v. Clamor*, 124 F.2d 717 (7th Cir. 1941), which held that an insurance policy with the "escape clause" was deemed primary over a policy with an "excess clause." 269 N.C. at 349-50, 152 S.E.2d at 442-43. The *Shelby Mutual* court examined *Zurich* in detail. In *Zurich*, a policy was issued by Zurich to the owner of a car "insuring him against liability for personal injuries arising out of the operation of an named automobile," and included an "omnibus" clause "which extended the coverage to any person 'while using the automobile . . . with the permission of the named insured.' " *Zurich*, 124 F.2d at

15

718. The omnibus clause, however, "was not applicable to 'any person . . . with respect to any loss against which he has other valid and collectible insurance.' " *Id.* The owner of the car allowed another man to drive the vehicle, and accident occurred. The driver himself had an insurance policy from Car & General which included an endorsement that stated the insurance "shall be excess over any other valid and collectible insurance available to the insured, either as an insured under a policy applicable with the respect to the automobile or otherwise, against a loss covered hereunder." *Id.*

The *Zurich* court explained that "[a] decision must rest upon a construction of the language employed by the respective insurers . . . . It will be noted that the language employed by Zurich in this respect is general in nature, while that employed by Car & General is specific, or at any rate, more specific than Zurich." *Id.* at 720. The *Zurich* court went on to say:

> There are cases which have held or indicated, under somewhat
> similar circumstances, that the specific language is controlling over
> the general. We think that construction should be applied in the
> instant situation. Any other construction would ignore the specific
> language employed by Car & General. The "excess insurance"
> provided by the latter is not "other insurance" required by Zurich.

*Id.*

After noting the holding in *Zurich*, the *Shelby Mutual* court observed: "It is apparent that the *Zurich* case did not hold there is an inherent quality in an 'excess' clause which makes it impossible for a company to provide in its own policy that its liability shall be excluded by the existence of another policy containing an 'excess' clause." 169 N.C. at 350, 152 S.E.2d 443. Turning to the case before it, the *Shelby Mutual* court stated:

> Here, the Shelby Mutual policy is not ambiguous with reference to the intent of
> the parties to exclude coverage under it where the other policy contains an

16

"excess" clause. The Shelby Mutual policy expressly makes the existence of such "excess" policy an event which sets the Shelby Mutual's exclusionary clause into operation. It states that a person in the category [of the driver] is an insured thereunder, "but only if no other valid and collectible automobile liability insurance, Either primary or excess . . . is available to such person."

*Id.* at 351, 152 S.E.2d at 443.

Thus, *Shelby Mutual* appears to teach not that the label "super escape" or "escape" controls the outcome of a battle of "other insurance" clauses, but rather, if a policy's "other insurance" clause is ambiguous, it must be construed in the manner most favorable to the insured, and that "[e]xclusions from and exceptions to undertakings by the company are not favored." *Id.* at 346, 152 S.E.2d at 440. Because the Shelby Mutual policy was not ambiguous, and under its express terms, an "excess" insurance policy precluded coverage, the terms were enforced.

### b. Application of *Shelby Mutual* to this case

Here, Medical Mutual contends Exclusion (g) is not ambiguous. As a reminder, Exclusion (g) states that coverage is not provided for:

> Damages arising out of or in connection with any injury resulting from rendering of or failure to render professional services by an Insured prior to the policy period if such damages are covered wholly or in part, by any other insurance or self-insured, retained risk or risk sharing plan or program.

Med Mut. Policy [DE-22-2] at p. 4. According to Medical Mutual, Exclusion (g) "clearly makes the applicability of an 'occurrence' policy, in effect prior to the inception of any potentially applicable Medical Mutual 'claims-made' policy, the event that sets the clause into operation." Med. Mutual Mem. in Support of Mot. for Summ. J. [DE-22] at p. 14.

There is no question that insurance in effect prior to Medical Mutual's policy period has

17

the potential to set into operation Exclusion (g), whether that insurance be occurrence-based or claims-based. As this court already has noted, the real question is what insurance constitutes "any other insurance" within the meaning of Exclusion (g). In other words, does "any other insurance" include insurance with an "excess clause"?

Based on this court's review of North Carolina law, the court predicts the North Carolina Supreme Court would rule that "any other insurance" does not include insurance with an excess clause. In *Horace Mann Insurance*, the North Carolina Court of Appeals, relying on *Shelby Mutual*, ruled that an "other insurance" clause providing that the "insurer shall not be liable [for] . . . any claim . . . which is insured by another valid policy or policies" was not triggered by another policy containing an "excess" clause. 54 N.C. App. at 555-56, 284 S.E.2d at 213-14. It appears to the court that there is no real difference between specifying "any other insurance" and "another valid policy or policies." Both phrases leave open the question of whether "excess" insurance can constitute "other insurance." Both are therefore ambiguous, and must be interpreted against the insurer, and in favor of coverage.[3]

_____

[3] The North Carolina Court of Appeals decision in *Horace Mann* also undercuts Medical Mutual's reliance on two cases from outside North Carolina in which courts gave effect to exclusions in claims-based policies for prior insurance even in the face of an "other insurance" clause in an occurrence-based policy. *See Evanston Ins. Co. v. Affiliated FM Ins. Co.*, 556 F.Supp. 135 (D. Conn. 1983); *Chamberlin v. Milo Whitney Smith*, 72 Cal. App. 3d 835, 140 Cal. Rptr. 493 (1977). Both those decisions turned on the placement of the respective "other insurance" clauses in the claims-based policies. Specifically, because the "other insurance" clauses were located in either the "Insuring Agreements" or "Exclusions" section of the relevant policies, rather than the "Conditions" section, they trumped the "other insurance" clauses in the occurrence-based policies. *See Evanston*, 556 F.Supp. at 138-39; *Chamberlin*, 72 Cal. App. at 850, 140 Cal. Rptr. at 501-02. Because Exclusion (g) is found within the Exclusions section its claims-based policy, Medical Mutual argues that the same result is dictated in this case.

As the North Carolina Court of Appeals' decision in *Horace Mann* indicates, however, North Carolina courts do not appear to rest upon the placement of an "other insurance" clause in

Therefore, Exclusion (g) is *not* triggered by the existence of an occurrence-based policy with an "excess" clause in effect prior to the Medical Mutual policy. Even where, as here, an insurance company includes a pre-policy acts requirement as part of its "other insurance" escape clause, a court still faces the issue of what constitutes the "other insurance." Decisions from North Carolina courts indicate that under North Carolina law, "other insurance" does not include another policy with an "excess" clause, unless the escape clause so expressly provides. *See Shelby Mutual*, 269 N.C. at 351, 152 S.E.2d at 443; *Horace Mann*, 54 N.C. App. at 555-56, 284 S.E.2d at 213-14.[4] Because Medical Mutual did not expressly provide in Exclusion (g) that an excess policy would exclude coverage, the existence of the American Casualty policy is not an event that sets into operation Exclusion (g).

---

a particular section of an insurance policy, but rather upon the specific language of the "other insurance" clauses in the respective policies. *See, e.g., Horace Mann*, 54 N.C. App. at 555-56, 284 S.E.2d at 213-14 (concluding that an "other insurance" clause, *located within the exclusions section of a policy* and providing that the "insurer shall not be liable [for] . . . any claim . . . which is insured by another valid policy or policies" was not triggered by another policy containing an "excess" clause). *See also Shelby Mutual Insurance*, 269 N.C. at 442-444, 152 S.E.2d at 348-53 (examining the "other insurance" language in an "exclusionary clause" in a policy's definition of an insured and concluding that a second policy was an event that set the exclusionary clause into operation; the court did not base its opinion on the placement of the "other insurance" clause in an "exclusionary clause"). *Cf. Home Indemnity Ins. Co. v. St. Paul Fire & Marine Ins.* Co., 229 F.3d 56, 62-63 (1st Cir. 2000)(rejecting, under Maine law, reasoning that one policy's "other insurance" clause in "coverage" section trumps another policy's "other insurance" clause located in another section because the reasoning depended on "semantic microscopy" and would encourage "draftsmanship battles and wasteful litigation").

[4] Were this court writing on a clean slate, it would be inclined to be of the opinion that the phrase "any other insurance" means just that–any other insurance, whether the insurance be excess or primary. This court, however, is not writing on a clean slate, and is instead bound to follow the law of North Carolina as stated by the North Carolina Supreme Court and, when appropriate, as predicted by the North Carolina Court of Appeals.

19

### 3. Comparison of Excess Clauses

Having concluded that Exclusion (g) is not triggered by the existence of the American Casualty policy, the court must now determine whether the "excess" clauses in both policies are mutually repugnant, and therefore the costs are shared pro rata between Medical Mutual and Accidental Casualty, or whether one policy is deemed "excess" to the other.

The North Carolina Court of Appeals has explained that under North Carolina law, where two "excess" policies are worded in such a way that it is impossible to distinguish between them or to determine which policy is primary, 'the clauses are deemed mutually repugnant and neither excess clause will be given effect.' " *Aetna Casualty*, 110 N.C. App. at 282, 429 S.E.2d at 409 (quoting *North Carolina Farm Bureau Mut. Ins. Co. v. Hilliard*, 90 N.C. App. 507, 511, 369 S.E.2d 286, 399 (1988)). The "excess" clause in the Medical Mutual policy provides:

> Except as provided in Exclusion "g", this insurance is excess over any other valid and collectable coverage applicable to a claim against any other Insured. All other insurance whether stated to be primary, pro rata, contributory, excess, or contingent will first apply, as will any other provision under a self-insured retained risk or risk sharing plan or program.

Med Mut. Policy [DE-22-2] at p. 8. American Casualty's excess provision, for its part, provides in pertinent part:

> If there is any other insurance policy or risk transfer instrument, including but not limited to self-insured retentions, deductibles or other alternative arrangements ("other insurance"), that applies to any amount payable under this Policy, such other insurance must pay first. It is the intent of this policy to apply only to the amounts covered under this Policy which exceed the available limit of all deductibles, limits of liability or self-insured amounts of the other insurance, whether primary, contributory, excess, contingent, or otherwise. This insurance will not contribute with any other insurance. In no event will we pay more than our limit of liability.

20

The America Cas. Policy [DE-22-3] at p. 5.

The "excess provisions" of both the Medical Mutual and American Casualty policies appear to state the same intent: in the event there is "other insurance" applicable to a claim, such "other insurance" provides primary coverage. Where the intent of "other insurance" clauses in two different policies are indistinguishable, they are deemed to be mutually repugnant and liability is prorated between the two companies. *Aetna Casualty*, 110 N.C. App. at 282, 429 S.E.2d at 409. American Casualty, however, argues it has what amounts to a "super excess" clause because it expressly provides "[t]his insurance will not contribute with any other insurance." The America Cas. Policy [DE-22-3] at p. 5.

This court predicts, however, that the North Carolina Supreme Court would agree with the ruling in *Horace Mann Insurance Company v. United International Insurance Company*, 762 F.Supp. 1470 (M.D. Ala. 1990), and find that the "will not contribute" language in the context of a co-primary insurance policy to be ambiguous, and as such, must be interpreted in favor of coverage. In *United International Insurance*, a high school student suffered a paralyzing injury during cheerleading practice, and sued the school board, the board of school commissioners, the individual school commissioners, and the high school principal, the school athletic director and the cheerleading sponsor. *Id.* at 1471. Horace Mann provided liability insurance coverage for the principal and cheerleading sponsor through a contract with the National Education Association. United International provided liability insurance coverage for all of the defendants in the lawsuit for "catastrophic injuries" arising out of athletic events. *Id.*

Both the Horace Mann and United International policies contained "excess clauses," but United International argued that its policy contained a "super-excess" clause that precluded

21

proration. The United International clause provided that "[b]enefits will be paid which are in excess of, but not contribute with, total benefits payable for the same loss under any other liability insurance." *Id.* at 1474. United International specifically relied on the holding in *Independent Fire Insurance Company v. Mutual Assurance*, 553 So.2d 115 (Ala. 1989).

*Independent Fire* was a declaratory judgment action concerning two companies' coverage of and duty to defend a personal injury action. The plaintiff, Independent Fire, was the insurer for the driver of a boat involved in the underlying accident, and the defendant, Mutual Assurance, had written an umbrella insurance policy for the boat's owner. As the court in *United International Insurance* summarized:

> The [Alabama Supreme] [C]ourt stated that an umbrella policy "is generally considered 'true excess' insurance and the last to provide coverage, after a primary policy or excess policy." [553 So. 2d at] 116. The court rejected Independent Fire's argument that, because both policies contained excess insurance clauses, both companies should contribute pro rata to provide coverage. It found that the language of the umbrella policy's excess clause-benefits "shall be in excess of, and not contribute with, such other insurance"–clearly expressed the intent of Mutual Assurance that its umbrella coverage would not be subject to proration.

*United International Insurance*, 762 F.Supp. at 1474.

United International argued that its position was equivalent to Mutual Assurance because its own excess clause specifically stated that it would "not contribute with" other insurers. The *United International Insurance* disagreed, explaining:

> [T]he decision in *Independent Fire* was specifically premised on the fact that Mutual Assurance's excess clause was part of an umbrella, or true excess policy. In denying proration the Court stated, "The 'other insurance' clauses of a primary policy with an excess clause and an umbrella policy are not equivalent and are not mutually repugnant so that they cancel each other." This court does not believe that under Alabama law a company should be able to alter its status as an excess insurer simply by including the phrase "not contribute with" in its excess clause,

22

outside of the special context of an umbrella policy. Such a fundamental redefinition of an insurer's status should be more explicit, not only for the benefit of other insurers but more importantly for the insured. The court finds the phrase "not contribute with" in a context outside an umbrella policy would be ambiguous and, therefore, must be construed in favor of coverage and against United International.

762 F. Supp. at 1474-75 (internal citations and footnote omitted).

This court agrees with the reasoning set forth in *United International Insurance* and finds it equally applicable to North Carolina law. At bottom, under North Carolina law, the court's task is to ascertain the intent of parties to a contract. *Gaston County*, 351 N.C. at 299, 524 S.E.2d at 563. The intent of both "excess" clauses, in the end, is to declare that the respective policy will be excess to any other insurance. Where, as here, both policies provide excess coverage by virtue of an "other insurance" clause, the court cannot discern any real difference between Medical Mutual's statement that any other insurance must first be applied, and American Casualty's additional statement that it "will not contribute." To hold otherwise would result in insurance companies attempting to state, in an increasingly more wordy and awkward manner, that they *really* will not contribute and "other insurance" will apply first.

Moreover, the court agrees with the *United International* court that in the context of umbrella policies, such anti-contribution language will take on a different gloss. But in the context of an "other insurance" "excess" clause, itself, the meaning and effect of such language is much less clear, and indeed, repetitive *and* ambiguous. Where the effect of a provision is ambiguous, the court has a duty to construe the policy in favor of coverage for the insured. *Allstate Ins. Co. v. Shelby Mut. Ins.* Co., 269 N.C. at 346, 152 S.E.2d 436 at 440. In this case, the court cannot construe the language in American Casualty's "other insurance" clause as elevating

23

it to a "super-excess" umbrella liability carrier. To the extent the Second Circuit reached a different conclusion, under Connecticut law, *see RLI Insurance Company v. Hartford Accident and Indemnity Company*, 980 F.2d 120 (2d Cir. 1992), this court respectfully disagrees.

The court, therefore, finds the two "excess" clauses to be mutually repugnant. The parties agree that if the "excess" clauses are mutually repugnant, then the coverage for indemnity payments should be prorated equally between Medical Mutual and American Casualty.

### 4. Responsibility for Defense Costs

Although the parties agree that the costs of indemnifying Smith should be prorated equally between them, they dispute whether the costs of defense also should be prorated.

Medical Mutual argues that it never had a duty to defend Smith because she never explicitly demanded a defense from the company, and consequently, pursuant to the North Carolina Supreme Court's decision in *Fireman's Fund Insurance Company v. North Carolina Farm Bureau Mutual Insurance Company*, 269 N.C. 358, 152 S.E.2d 513 (1967), American Casualty is precluded from seeking contribution of the defense costs. Medical Mutual's argument raises two separate issues for the court: (1) Was Smith required to explicitly demand that Medical Mutual provide a defense, and (2) if not, does the North Carolina Supreme Court's decision in *Fireman Fund* prevent American Casualty from seeking contribution for the defense costs?

### a. Duty to Defend Smith

The first question for the court is whether Smith was required, under the policy, to explicitly demand a defense from Medical Mutual in order to trigger Medical Mutual's duty to defend.

24

"An insurer's duty to defend suits against its insured is determined by the language in the insurance contract." *Brown v. Lumbermens Mut. Cas. Co.*, 326 N.C. 287, 392, 390 S.E.2d 150, 153 (1990). The record shows that the Medical Mutual policy includes a section detailing the rights and duties of Medical Mutual, and specifically provides: "The Company shall have the right and the duty to defend any suit against the Insured under Insuring Agreements A and B above, even if any of the allegations of the suit are groundless, false or fraudulent, subject to the Exclusions and Conditions and other terms of the policy." Medical Mutual Policy [DE-22-2] at p. 6. The Medical Mutual policy also provides that coverage under the policy applies only "if the Company is provided written notice during the policy period of a claim for damages." *Id.* at p. 1. Written notice may include either a copy of a filed suit against the insured or a copy of a written notification of a demand for money or services. *Id.* at p. 2. Consequently, reading the policy as a whole, once an insured provides written notice of a suit against him for damages arising out the rendering of, or failure to render, professional services, Medical Mutual's duty to defend is implicated. The court has not located, nor has Medical Mutual identified, a provision within the Medical Mutual policy requiring the insured to explicitly demand a defense.

The record also shows that Smith, on March 15, 2006, sent a letter to Medical Mutual with a copy of the summons and complaint in the Rountree Action attached thereto. This alone would seem to trigger Medical Mutual's duty to defend Smith in the Rountree Action. Moreover, as Medical Mutual itself notes, its "practice and procedure permit[s] each named insured on a Medical Mutual claims-made policy issued to a medical practice . . . to receive the benefit of the original report date." Medical Mutual's Resp. to Second Interrogatories and Req. for Prod. of Docs. [DE-22-5] ¶ 4. It is undisputed that Medical Mutual considered Smith "to have provided

25

notice of Ms. Rountree's claim against her on April 1, 2005, the date that Dr. Sonnino first provided notice of the claim to Medical Mutual." *Id.* Under the plain terms of the Medical Mutual policy, there was nothing else for Smith to do to receive the benefit of a defense from Medical Mutual. *See St. Paul Fire & Marine Ins. Co. v. Hanover Ins. Co.*, No. 5:99-CV-164-BR-3, 2000 WL 34594777 (E.D.N.C. Sept. 19, 2000)("[A]s a legal matter, the court agrees . . . that [the insured] was not required to tender the defense to [the insurance company] directly under the terms of the . . . policy. . . . [T]here is no requirement in the . . . policy, or in any reported North Carolina case, that an insurer's defense obligation is contingent upon an insured's explicit request, made directly to the insurer, that the insurer provide a defense."). Accordingly, the court finds that Medical Mutual had a duty to defend Smith.

### b. *Fireman's Fund*

Despite Medical Mutual's arguments to the contrary, the court also does not find that the North Carolina Supreme Court's decision in *Fireman's Fund* precludes American Casualty from seeking contribution for Medical Mutual's share of defense costs.

The facts underlying *Fireman's Fund* are as follows: an injured party brought suit against the named insured in an automobile liability policy and against the driver of the truck owned by the named insured. 269 N.C. at 359, 152 S.E.2d at 515. The insurer of the owner refused to defend on behalf of the driver, and the driver then called on his liability insurers, whose policies covered only liability in excess of other insurance, to defend the action. *Id.* The driver's insurers hired attorneys to defend him, but then subsequently withdrew their defense of the driver based upon evidence developed in the case which excluded coverage under their policies. *Id.* at 360, 152 S.E.2d at 516. The owner's insurer then settled the claim and secured a release of the

26

claims against owner and the driver. *Id.* The driver's insurers then instituted an action against the owner's insurer to recover the attorney's fees they paid while defending the driver, under the theory of subrogation. *Id.*

The *Fireman's Fund* court upheld the trial court's order denying recovery to the plaintiff excess insurers. In so doing, the court explained that the driver never had an obligation to pay the attorney's fees for the counsel hired by the plaintiffs, and consequently, the driver never had a right to recovery against anyone for the fees paid to counsel. As a result, the subrogation clauses in the plaintiffs' policies had no application to the case. *Id.* at 361, 152 S.E.2d at 516.

The court also concluded that the plaintiffs had no subrogation rights as an "operation of law." The court reasoned that injured party in the underlying suit claimed in excess of the limit of the owner's policy so that plaintiffs had their own interests to protect , and each insurer had a distinct and separate obligation to provide a defense for the driver. The court also noted that the defendant, the owner's insurer, was the one that actually brought the underlying suit to a conclusion and secured the release of the driver–"without any loss or liability" to the driver. Under those circumstances, the *Fireman's Fund* court said the driver himself had no right of recovery against the owner's insurance, and therefore, plaintiffs had no right of recovery under *subrogation. Id.* at 361-62, 152 S.E.2d at 516-17.

The *Fireman's Fund* court went on to say that the plaintiffs also were "not entitled to recover upon any theory of benefits derived by the defendant from such services," because the record was devoid of any evidence that the defendant actually "received the benefit of any legal research or of any investigation made by the attorneys, or that the defendant's settlement and disposition of the [underlying] suit was facilitated in any way by the services of the attorneys so

27

employed by the plaintiffs." *Id.* at 362-363, 152 S.E.2d at 517. Indeed, the record only showed that the attorneys hired by plaintiff "appeared" on behalf of the driver, took a deposition of the injured party, and then withdrew from representation of the case. *Id.*

Thus, *Fireman's Fund* stands for the proposition that "[a]n insurer who has a duty to defend its insured may not recover its defense costs, under a theory of equitable subrogation, from another insurer who also has a duty to defend the insured." *Nationwide Mut. Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 122 N.C. App. 449, 453, 470 S.E.2d 556, 559 (1996). It does not stand for the proposition that an insurer, who had a duty to defend its insured, may not recover a portion of its defense costs, pursuant to another equitable theory, from another insurer who also had a duty to defend the insured. *Id.* at 454, 470 S.E.2d at 559 (explaining that the insurer, who had a duty to defend, could not recover any portion of its defense costs or settlement payments under a subrogation theory, but could "proceed by way of contribution" to recover the "defendant's share of defense costs incurred and settlement payments made to settle the tort suit"). Indeed, the North Carolina Court of Appeals has recognized that where two insurers both have a duty to defend, "equity dictates that the defense costs be shared among the two insurers." *Ames*, 340 S.E.2d at 486. *See also St. Paul Fire & Marine Ins. Co. v. Vigilant Ins. Co.*, 919 F.2d 235, 241 (4th Cir. 1990)(relying on *Ames* and ruling that once an insurer is shown to have breached its duty to defend, the remedy of the breach is that it should share equally in the costs of defending the insured).

As discussed above, Medical Mutual had a duty to defend Smith in the Rountree Action. It chose not to do so. Medical Mutual cannot argue that, like the defendant in *Fireman's Fund*, it did not receive any benefit from the representation of Smith funded by American Casualty.

28

Consequently, Medical Mutual must share equally in the defense costs.

## C. Affidavit of Dana Beal

In support of its Motion for Summary Judgment, American Casualty filed the affidavit of Dana Beal [DE-25], purportedly under seal. Under the Local Rules, however, a party seeking to file material under seal must first file a motion seeking leave to do so. Local Civil Rule 79.2. Moreover, for any such motion to be allowed, a party must make a showing in compliance with *Stone v. University of Maryland*, 855 F.2d 178 (4th Cir. 1988) and *In re Knight Publishing Co.*, 743 F.2d 231 (4th Cir. 1984).

Accordingly, American Casualty is DIRECTED to file a motion for leave to file the affidavit of Dana Beal under seal within fourteen (14) days of the filing date of this order. The affidavit [DE-25] shall remain under seal pending the court's ruling on any motion to seal filed by American Casualty. Should American Casualty choose not to file a motion to seal within ten (10) days of the filing date of this order, the affidavit will be unsealed.

## IV. CONCLUSION

For the foregoing reasons, the parties' cross-Motions for Summary Judgment [DE-21; DE-23] are both ALLOWED in part and DENIED in part.

It is hereby ORDERED, ADJUDGED and DECREED that (1) Exclusion (g) in the Medical Mutual policy does not apply; (2) the excess "other insurance" clauses in the Medical Mutual and American Casualty policies are mutually repugnant, and (3) Medical Mutual Policy number PG112673 and American Casualty Policy policy number 0160624325 provide Mechelle Smith with co-primary insurance.

It is further ORDERED that Medical Mutual to pay American Casualty one-half (½) the

29

cost of Mechelle Smith's defense and indemnification in the Rountree Action, plus prejudgment interest at the applicable legal rate from the date of American Casualty's payment of those amounts through the date of this order. The parties are DIRECTED to confer and file a proposed final judgment within fourteen (14) days of the filing date of this order. Should the parties deem it necessary, they may file a motion for leave to submit the proposed final judgment under seal.

Furthermore, American Casualty is DIRECTED to file, within fourteen (14) days of this order, a motion to seal the affidavit of Dana Beal [DE-25]. If American Casualty fails to file a motion within fourteen (14) days, the affidavit will be unsealed.

SO ORDERED.

This the 4 day of June, 2010.

_James C. Fox_

JAMES C. FOX
Senior United States District Judge